IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| GREGORY WAYNE ALFORD, ) | Civil Action No. 3:04-23257-CMC-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| SOUTH CAROLINA DEPARTMENT OF ) | |
| CORRECTIONS, ) | **AMENDED** |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |
| ) | |

Plaintiff, Gregory Wayne Alford ("Alford"), filed this action on December 14, 2004. He alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII").[1] Defendant, the South Carolina Department of Corrections ("SCDC") filed a motion for summary judgment on December 5, 2005. Alford filed a memorandum in opposition to summary judgment on December 30, 2005. SCDC filed a reply on January 13, 2006.

SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean

---

[1] Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen.

2

Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1.  Alford, a black male, was hired by SCDC in 1995.  He began his career as a correctional officer at Evans Correctional Institution ("ECI") and was promoted to Sergeant in 1997. In 1999, he was promoted to Lieutenant and was assigned as an instructor at the training academy in Columbia, South Carolina.  In January 2002, Alford was reassigned to ECI as an Operational Lieutenant.  He was transferred to the position of Shift Lieutenant at ECI in June 2002.  Alford Dep. 42-43; Alford Aff., Paras. 2-4.

2.  In January 2003, Alford thought that ECI Associate Warden Robin Chavis ("Chavis"), a white female, was favoring white employees over black employees regarding work assignments and operational issues and was promoting favoritism of white inmates over black inmates.  He brought these concerns to the attention of ECI Warden Willie Eagleton ("Eagleton"), a black male.  Alford Aff., Para. 5-6; Eagleton Dep. 12-15.

3.  Eagleton arranged to meet with Chavis, Alford, and ECI Human Resources Director Rosa Henegan ("Henegan"), a black female.  The meeting, held on January 24, 2003, was tape recorded and Henegan made a transcription of the tape.  Alford's concerns about alleged racial favoritism by Chavis were aired and the discussion at the meeting became somewhat

heated at times. Alford Aff., Para. 6; Eagleton Dep. 20-24 and Plaintiff's Ex. 1; Robert Ward Dep. 15-16.

4.  At the end of the meeting, Chavis stated:

    > The EEOC you just didn't just throw that out for no reason, let me tell you this, I have already contacted work force relations I am not going to let this go, I'd hope[d] after this conversation I could get a better insight from where you were coming from, or may[be] you really just misunderstand some things or whatever, but no, I think it is malicious, I think it is close[d] minded, and I think it is prejudice on your part. I plan on pursuing this. I think your comments are insubordinate and unprofessional.

    Alford Dep., Defendant's Ex. 3 at p. 18.

5.  Eagleton sent the tape and transcription to SCDC Institution Division Director for the maximum security prisons (which included ECI) Robert Ward ("Ward"), a white male. The transmittal letter provided that the January 24, 2003 meeting was held in Eagleton's office "to discuss accusations of racism made by Lt. Alford against A/W Chavis." Eagleton Dep. 21-22; Eagleton Dep., Plaintiff's Ex. 1 (transmittal letter and tape transcript).

6.  On March 5, 2003, Ward met with Alford, Eagleton, and Henegan to discuss the situation. Alford thought that the meeting did not go well and that Ward did not appear to be interested in his allegations of race discrimination. Alford Aff., Para. 8. Alford claims that Ward called the meeting to a halt and stated "I don't give a damn about racial discrimination." Alford Aff., Para. 8; Alford Dep. 147-152.[2]

---

[2] Ward denies making such a statement and states that he ended the meeting and instructed Alford to leave the room after Alford ignored requests to lower his voice. Ward Dep. 38-39.

4

7. The meeting was tape recorded. After the meeting, Ward took the tape with him and later turned it over to the Inspector General's office. The recording is "distorted". Ward Dep. 21-22; Alford Dep. 140-142.

8. At the conclusion of the meeting, Ward and Henegan interviewed five black officers who worked on Chavis's shift and reported to Alford. Some of those interviewed indicated that Chavis may have displayed favoritism, but none attributed the favoritism to race discrimination. Ex. 2 to Defendant's Motion for Summary Judgment (Incident Reports-Interviews of Officers); Ward Dep. 7.

9. Less than two weeks after the March 5, 2003 meeting, Ward received a phone call from his wife (who is also an SCDC employee). She told Ward that she received an anonymous phone call in which the caller told her that her husband was involved in a long standing extra-marital affair with Henegan. Ward went to the Inspector General's office and informed Alice Maceo ("Maceo"), an employee in the Inspector General's office and Inspector General Charles Sheppard ("Sheppard") about the call. Ward Dep. 24-25.

10. On March 18, 2003, a second, similar call was received on the SCDC inmate hotline system. Ward Dep. 26.

11. Maceo notified Ward of the hotline call. Ward went to the Inspector General's office and Maceo played the phone call for Ward in the presence of Sheppard. Sheppard and Maceo asked Ward if he was able to identify the voice of the female caller. Ward responded that he thought the voice sounded like Plaintiff's wife, Joan Alford, who was a former SCDC employee. He believed the caller might have been Joan Alford because Joan Alford's

5

husband was dissatisfied with Ward's decision not to uphold his discrimination complaint. Ward Dep. 26-27.

12. An investigation was instituted by the Inspector General's office. The investigation revealed that several anonymous telephone calls were made in March and April 2003 (including a call to the Inspector General's office, two calls to the administrative office at ECI, and a recorded call to the SCDC hotline) concerning an alleged improper sexual relationship between Ward and Henegan. See Defendant's Motion for Summary Judgment, Ex. 3 (Investigative Report); Estes Dep. 11-14.

13. Estes interviewed Ward and Henegan who both denied the alleged sexual relationship. Estes Dep. 30.

14. Estes played the anonymous hotline tape for other employees at ECI, including Eagleton, Investigator Jimmy Griffin, and Administrative Assistant Sonja Page, who thought the caller's voice was that of Joan Alford. See Estes Dep. 32; Defendant's Motion for Summary Judgment, Ex. 3.

15. The investigation revealed that on March 18, 2005, a call was made from Alford's home phone to the hotline in the same time frame as the anonymous call in question. Defendant's Motion for Summary Judgment, Ex. 4 (Phone Records); Estes Dep. 32.

16. Alford was interviewed and denied any knowledge of the identity of the anonymous caller. See Alford Aff., Para. 11. He also submitted a handwritten statement on April 8, 2003 in which he wrote:

> About five years ago, at Evans Correctional Institution, about during accreditation time, the following took place: the inmates observed Mr. Ward and Ms. Hennegan [sic] on the yard together. I heard some of the inmates say "look at them together." It seemed that the inmates were

6

> indicating that they had a personal relationship with each other. Mr. Ward and Ms. Hennegan also went to lunch together often. Some of the staff perceived this to mean that they were having a personal relationship….I do not have any knowledge that my wife, Joan Alford, has made any anonymous calls to SCDC staff, and to the SCDC hotline, and reporting a relationship between Mr. Ward and Ms. Hennegan.

Defendant's Motion for Summary Judgment, Ex. 5.

17. Estes asked Alford to take a polygraph examination with Estes on May 12, 2003. Alford refused, stating that he refused to take a polygraph examination unless Ward also took an examination. On May 19, 2003, Alford received a letter dated May 16, 2003, from the Director of SCDC (Jon Ozmint), directing him to take the polygraph examination. Alford again refused, stating that he would take the examination if Ward also took one. On May 20, 2003, Sheppard directed Alford to take the polygraph examination. He warned Alford that he would be terminated if he did not take the examination. Once again Alford refused to take the examination unless Ward was required to take the polygraph examination as well. Alford Aff., Paras. 11-16; Defendant's Motion for Summary Judgment, Exs. 7-8.

18. On May 21, 2003, Eagleton reviewed Sheppard's letter with Alford. Alford informed Eagleton that he would not be attending the polygraph examination, but would be reporting to work. Defendant's Motion for Summary Judgment, Ex. 9.

19. On May 22, 2003, Eagleton gave Alford a letter notifying him of his administrative suspension for refusing Ozmint's instructions that he submit to a polygraph examination. Alford was also presented an Employee Corrective Action form and given an explanation of his grievance and appeal rights. Defendant's Motion for Summary Judgment, Exs. 10-11.

20. In a letter dated May 28, 2003, Robin Gracien, Chief of SCDC's Employee Relations Branch, notified Alford that his termination was effective May 22, 2003 for refusing to submit to a polygraph examination. Alford appealed his termination to the State Employee Grievance Committee which denied his appeal on December 2, 2003. Defendant's Motion for Summary Judgment, Ex. 12.

21. Alford filed a charge with the Equal Employment Opportunity Commission and the South Carolina Human Affairs Committee in February 2004, alleging discrimination based on race and retaliation. See Defendant's Motion for Summary Judgement, Ex. 12.

## MOTION FOR SUMMARY JUDGMENT

Alford alleges that he was subjected to disparate treatment based on his race and that he was retaliated against for reporting unlawful conduct. SCDC contends that it is entitled to summary judgment because: (1) Alford fails to establish a prima facie case of disparate treatment; (2) Alford fails to establish a prima facie case of retaliation; and (3) SCDC has articulated a legitimate, non-discriminatory reason for terminating Alford which Alford fails to show is pretextual.

A. Disparate Treatment

Alford alleges that he was terminated based on his race in violation of Title VII. Complaint at 3. He claims that the reason given for his termination, refusal to submit to a polygraph examination, is pretextual.

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

8

individual's race, color, religion, sex, or national origin…." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff relying on indirect evidence[3] must establish a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class."[4] Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir.2004) (en banc). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

SCDC contends that Alford fails to establish a prima facie case because he has not shown that he was meeting his employer's legitimate expectations and he cannot show that he was

---

[3] Alford has not presented any direct evidence of discrimination. The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor…" Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), cert. denied, 454 U.S. 860 (1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (evidentiary standard for mixed-motive jury instruction).

[4] In Miles v. Dell, Inc., 429 F.3d 480 (4th Cir. 2005), the Fourth Circuit held that in appropriate cases, a Title VII plaintiff can make out a prima facie case without satisfying prong four by showing that the firing and replacement hiring decisions were made by different decisionmakers. Id. at 485.

9

replaced by someone outside the protected class. Alford has not addressed SCDC's arguments, but instead contends that his claims should be analyzed as a case of disparate discipline.

In the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas to establish a prima facie case of disparate discipline by offering proof that:

> (1) he is a member of a protected class under Title VII;
>
> (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and
>
> (3) he suffered more severe discipline for his misconduct as compared to those employees outside the protected class.

See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir.), cert. denied, 472 U.S. 1021 (1985).

Therefore, Alford must show that he was more severely disciplined than his white comparators for engaging in comparable conduct. To make this showing, he must show that he and his comparators were "similarly situated." In order for the Court to determine whether Alford and his comparators were similarly situated, the Court "'must look at all relevant factors, the number of which depends on the context of the case.'" Disher v. Weaver, 308 F.Supp.2d 614, 621 (M.D.N.C. 2004), quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000)." "Summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated white employees were treated more favorably." Gaither v. Wake Forest Univ., 129 F.Supp.2d 863, 869 (M.D.N.C. 2000). When analyzing plaintiff's claim, the Court must consider the entire record and not merely focus on a single part of the record. Carter v. Ball, 33 F.3d 450 (4th Cir. 1994).

Although the Fourth Circuit has given little guidance on this issue, it has been noted that "a plaintiff must show that he or she was similarly situated to other employees from outside his protected class in all relevant aspects." Truesdale v. Potter, 2003 WL 1522945, *5 (M.D.N.C. 2003), citing Radue, 219 F.3d at 617; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Additionally, a plaintiff must offer sufficient proof to show that the similarly situated person from outside his protected class were not similarly disciplined for like offenses. Moore, 754 F.2d at 1107-11. While the conduct does not have to be identical, the similarly situated employee must have engaged in conduct of "comparable seriousness." Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).

Under this framework, Alford fails to establish a prima facie case of disparate discipline because he cannot show that Ward engaged in prohibited conduct comparable in seriousness to that in which he engaged. Alford was ordered to submit to a polygraph examination and refused to do so. There is no indication that Ward was ordered to submit to a polygraph examination or that he refused to do so. Further, Alford has not shown that a similarly-situated employee who refused to take a polygraph examination was disciplined less severely.

### B. Retaliation

Alford alleges that SCDC retaliated against him for objecting to unlawful employment practices. SCDC contends that it has articulated a legitimate, non-discriminatory reason for Alford's termination that Alford fails to show is pretextual.

To establish a prima facie case of retaliation under Title VII, an employee must demonstrate that:

    1)    the employee engaged in protected activity;[5]

    2)    the employer took some adverse employment action against the employee; and

    3)    a causal connection existed between the protected activity and the adverse action.

See Haulbrook v. Michelin N. Am., Inc., 252 F.3d. 696, 706 (4th Cir. 2001)(ADA); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994)(Title VII); and Culver v. Gorman & Co., 416 F.3d 540 (7th Cir. 2005)(Title VII and Equal Pay Act). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

Alford claims that he has establish a prima facie case because he engaged in the protected activity of reporting his concerns about racism and racial favoritism to Eagleton and Ward, he suffered the adverse employment action of termination, and he established a causal link as the adverse employment action occurred shortly after the protected activity. SCDC does not appear to dispute that Alford has established a prima facie case of retaliation, but contends that it has articulated a legitimate, non-discriminatory reason for Alford's termination, that he was terminated for refusing to take a polygraph test.

---

[5] Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Indus., Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

Viewing the facts in the light most favorable to Alford, there is a genuine issue of material fact as to whether SCDC's articulated reason for Plaintiff's termination is false. SCDC policies provide that when an employee is unwilling to submit to a polygraph examination that is deemed necessary, the employee can be directed to take a polygraph examination concerning an administrative matter by the agency director. The SCDC policies and procedures, however, provide that an employee "will be asked questions specifically, narrowly, and directly relating to the performance of his/her official duties." See Defendant's Motion for Summary Judgment, Ex. 6 at 8. Here it is unclear what questions were to be asked about the anonymous phone calls that would have been directly related to Alford's performance of his duties. Further, the parties do not dispute that the anonymous caller was female. The investigation concerned alleged misconduct between Ward and Henegan, but the reasons for the polygraph appear to be focused on determining who made the anonymous calls rather than investigating the alleged misconduct. Additionally, Ward, who allegedly told Alford that he did not care about discrimination, reported that he thought the calls had been made by Alford's wife because Alford was dissatisfied with Ward's decision not to uphold Alford's discrimination claims.

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 18) be granted as to Plaintiff's claim of race discrimination and denied as to his claim of retaliation.

                          Respectfully submitted,

                          s/Joseph R. McCrorey
                          United States Magistrate Judge

May 25, 2006
Columbia, South Carolina