IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| GREGORY WAYNE ALFORD, | ) | Civil Action No. 3:04-23257-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | OPINION AND ORDER |
| vs. | ) | GRANTING MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| SOUTH CAROLINA DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court for review of the Report and Recommendation ("Report") of The Honorable Joseph R. McCrorey, United States Magistrate Judge. Dkt No. 43. The Report recommends that Defendant's motion for summary judgment (Dkt No. 18) be granted in part and denied in part. Specifically, the Report recommends that summary judgment be granted as to Plaintiff's race discrimination (disparate discipline) claim but denied as to Plaintiff's retaliation claim. Both claims are pursued under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

Neither party has objected to the recommended grant of summary judgment as to the race discrimination claim.[1] This recommendation is, therefore, adopted and summary judgment granted as to this claim for the reasons set forth in the Report.

Defendant, the South Carolina Department of Corrections ("SCDC"), has, however, filed an objection to the recommendation that summary judgment be denied as to the retaliation claim. Plaintiff, Gregory Wayne Alford ("Alford"), has filed a memorandum in opposition to Defendant's

---

[1] By letter dated May 30, 2006, Plaintiff's counsel advised the court that Plaintiff did not take exception to the Report and Recommendation.

objection, asserting that the claim should survive to trial. For the reasons set forth below, the court concludes that Defendant is entitled to summary judgment on the retaliation claim.

**STANDARD**

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. *See* 28 U.S.C. § 636(b)(1). The court reviews only for clear error in the absence of an objection. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'") (quoting Fed. R. Civ. P. 72 advisory committee's note).

**FACTS**

No objections have been made to the statement of facts set forth in the Report. The Report's statement of facts is, therefore, adopted by this court. The facts most critical to the present order are, however, summarized below:

1. Plaintiff (Alford), a black male, complained of racial discrimination by one of his superiors, Associate Warden Robin Chavis ("Chavis"), a white female. A meeting to discuss the complaint was arranged between Alford, Chavis, and Human Resources Director Rosa Henegan ("Henegan"), a black female. The meeting ended in a heated exchange in which Chavis accused

Alford of making a malicious complaint as well as being the one who was prejudiced.

2. A second level meeting took place with the Institution Division Director, Robert Ward ("Ward"), a white male. This meeting also did not go well, with Ward allegedly calling the meeting to a halt and stating: "I don't give a damn about racial discrimination." This meeting was also attended by Henegan. The tape of this meeting, which was in Ward's control after the meeting and was subsequently turned over to the Inspector General, is "distorted."

3. Less than two weeks after the second level meeting, Ward's wife (also an SCDC employee) told Ward that she had received an anonymous phone call advising her that Ward was engaged in a long standing extra-marital affair with Henegan. Ward reported this call to the Office of the Inspector General ("IG").

4. A second similar call was received on the inmate hotline system. An IG employee brought the call to Ward's attention, and played the recorded call for him to see if Ward could identify the voice of the female caller. Ward indicated he believed the caller might be Alford's wife, a former SCDC employee. This conclusion was based, at least in part, on Ward's belief that Alford was dissatisfied with Ward's decision not to uphold Alford's discrimination complaint.

5. The IG commenced an investigation which revealed four calls to various SCDC numbers in which the caller alleged that Ward and Henegan were having an affair. At least one of these calls was recorded (the hotline call).

6. Ward and Henegan were interviewed by an IG employee. Both denied having a sexual relationship.

7. The IG investigator played the hotline tape for three SCDC employees (other than the Wards or Henegan). All three stated they believed the caller to be Alford's wife. Further

3

investigation revealed that a call was made to the hotline from Alford's home around the time of this recorded call.

8. Alford was interviewed and denied any knowledge of the calls. He also denied any knowledge of the calls in a written statement. His written statement also addressed any evidence he might have of the alleged affair. As to this issue, he stated only that he was aware that inmates had once commented "look at them together," referring to Henegan and Ward when they had been on the yard, and to knowledge that Henegan and Ward often lunched together. Alford opined, based on these facts that: "Some of the staff perceived this to mean that [Ward and Henegan] were having a personal relationship."

9. The IG investigator asked Alford to take a polygraph examination. Alford refused unless Ward was also required to take an examination. Alford was then directed by letter from the Director of SCDC to take the polygraph examination. He again gave the same conditional refusal. Alford was again directed to take a polygraph examination, this time by letter from the IG. This letter informed Alford that he would be terminated if he did not comply. Alford again gave the same conditional refusal. The IG letter was, thereafter, reviewed with Alford who, again, stated he would not attend the polygraph examination.

10. Alford was, thereafter, suspended and then terminated. The stated reason for the termination was that Alford had refused to comply with the requirement that he take a polygraph examination.

11. Pursuant to SCDC policies and procedures, employees may be required to submit to polygraph examinations concerning administrative matters with the questions being limited to those which are "specifically, narrowly, and directly relat[ed] to the performance of . . . official duties."

**DISCUSSION**

It is undisputed that Alford engaged in protected activity (complained of racial discrimination) and suffered a subsequent adverse action or event (termination). The court, therefore, assumes for present purposes that Alford has satisfied the first two prongs of his three part prima facie case for retaliation.[2] It is the third prong, a causal connection between the complaint and the termination, which SCDC argues cannot be satisfied. In addition, SCDC argues that Alford has not presented evidence from which a jury could find that SCDC's proffered reason for the termination (Plaintiff's repeated refusal to comply with a directive to take a polygraph examination) was pretextual.

There is at least some evidence linking the requirement that Alford take a polygraph examination to his earlier race discrimination complaint. That is, Ward suspected that the female caller may have been Alford's wife, at least in part, because Ward believed Alford was dissatisfied with the way Ward handled Alford's complaint. For present purposes, therefore, the court assumes without deciding that the evidence is sufficient to allow a jury to find that Ward's decision to identify Alford's wife as the likely caller was in some manner motivated by Ward's dissatisfaction with Alford's race discrimination complaint.[3]

---

[2] *See generally Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 706 (4th Cir. 2001) (stating requirements of prima facie case in context of an ADA claim); *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998) (stating requirements in context of ADEA and Title VII claims).

[3] This is not to say that Ward's statement is an admission of retaliatory animus. If Ward's stated belief (that *Plaintiff* was trying to retaliate against Ward through these calls) was, in fact, his true belief, that would not be evidence of a retaliatory motive *by Ward*. Nonetheless, it does provide some connection between the complaint and the later request that Plaintiff submit to a polygraph examination.

It is also reasonable to conclude that Ward's identification of Alford's wife as the caller was the first link in the causal chain which ultimately led to Alford's termination. There are, however, intervening steps which make the ultimate connection quite attenuated.

The next link in the chain is the decision to require Alford to submit to a polygraph examination. This decision was not based solely on Ward's statements. Rather, before Alford was asked (then directed) to submit to a polygraph examination, three other individuals identified the voice on the tape as sounding like Alford's wife. In addition, SCDC determined that a call had been made from Alford's home to the hotline around the time of the recorded call. Together, this evidence gave SCDC officials a reasonable basis for believing that Alford may have been involved in encouraging or making the accusatory calls, or might at least have knowledge of them.[4] Alford, in contrast, has offered no evidence from which a jury could conclude that SCDC officials did not have a reasonable basis for believing that Alford either had been involved in or had knowledge of the calls.

SCDC has also proffered legitimate reasons for requiring a polygraph examination of any employee they believed had information relating to the calls. Specifically, SCDC proffered testimony that the polygraph examination would have been used to aid in the investigation of the caller's allegations (of an ongoing affair between managerial employees) or, alternatively, to determine whether someone was spreading false and malicious rumors for the purpose of undermining management.

---

[4] This is true even if Ward's statement of identification is totally discounted as evidence connecting Alford to the calls.

6

Drawing all reasonable inferences in Alford's favor, a jury might conclude that SCDC had already discounted the first possibility, believed the second to be true, and was targeting Alford as a likely suspect. No evidence, however, suggests that such conclusions were reached based on an intent to retaliate against Alford for having pursued a discrimination complaint, even if Ward's initial identification of Plaintiff's wife as the likely caller was so motivated. Instead, the only evidence suggests that if SCDC officials reached such conclusions, they did so based on a belief that *Alford* was engaged in some form of reverse retaliation against Ward because Alford was dissatisfied with how his complaint was handled.[5]

Even assuming some improper motivation on Ward's part carried through to the decision to require Alford to submit to a polygraph examination, that decision would, at most, support a finding of a weak and attenuated mixed-motive link between Alford's initial complaint and the *requirement to submit to the polygraph examination*. Several more steps, however, remain before any such motive may be connected to Alford's *termination*, which is the event to which Alford has directed his complaint.[6]

---

[5] The court is aware of nothing in the law that would prohibit investigation of an employee believed to be engaging in such actions.

[6] Alford does not argue that he suffered any damages *directly* as a result of the requirement to take the polygraph examination. His concession that he was willing to take a polygraph examination so long as Ward was also required to take one is, in any event, inconsistent with such a claim. Moreover, under the circumstances of this case, the requirement to take a polygraph examination would not be a "materially adverse" event sufficient to support a Title VII retaliation claim because it would not likely have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington Northern & Sante Fe Railway Co. v. White*, ___ U.S. ___, Slip. Op. No. 05-259 at 9 &13 (June 22, 2006) (holding Title VII's anti-retaliation provisions are not limited to discriminatory actions that affect the terms and conditions of employment but reach other employer actions which "a reasonable employee would [find to be] materially adverse," and defining the latter to include actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination").

7

As noted above, Alford was requested and then directed to take a polygraph examination. Such examinations are allowed by SCDC policy, subject to limitations as to the subject matters of questions. At least two of the directives were in written form. The second of the letters was reviewed with Alford before his final refusal to submit to the polygraph examination. Alford repeatedly refused to submit to a polygraph examination unless Ward was also required to submit. Alford's termination was the direct result of this third or fourth refusal. There is no evidence that Alford would have been terminated had he submitted to the polygraph examination.[7]

Alford's refusal to submit to the polygraph examination is, therefore, the indisputable direct cause of his termination. At most, the first event in the chain leading to the request that Alford submit to a polygraph may have involved a mixed retaliatory motive. There is no evidence that any such mixed motive carried through to Alford's termination following his repeated conditional refusals to submit (unless Ward also submitted to a polygraph examination). Indeed, SCDC's repeated requests suggest a contrary conclusion: that SCDC wanted Alford to submit to the polygraph examination. Therefore, under the specific circumstances of this case, including SCDC's reasonable basis for requiring the taking of a polygraph examination and the policies and procedures which allowed for such an examination, the court concludes that Alford's repeated refusal to submit to the examination constituted a break in the causal chain between his initial claim of discrimination and his termination.

---

[7] The Magistrate Judge concluded that Alford had proffered evidence of pretext based, in part, on doubts as to whether there were any inquiries which might properly be posed during the polygraph examination given that SCDC policies limit polygraph questions to those "specifically, narrowly, and directly relating to the performance of [the employee's] duties." This was not, however, the basis on which Alford refused to submit to the polygraph. Moreover, were this the basis of his objection, he could have submitted to the polygraph examination but refused to answer questions which went beyond the scope of the policies. Were Alford terminated for such a refusal, he might have a claim for breach of contract.

Even were the court to conclude that Alford had made an adequate showing of causation to make out his prima facie case, the court would conclude that Alford failed to show that the reason for his termination was pretextual. What evidence is offered (and what is discussed in the Report) relates to whether the *requirement* to submit to the polygraph examination was improper. It does not provide a basis for doubting that Alford was, in fact, terminated because he refused to submit to a polygraph examination.

For the reasons set forth above, the court concludes that Alford has failed to present evidence to support the third element of his prima facie case (a causal link between his complaint and his termination) and has, likewise, failed to present evidence to support his claim of pretext. SCDC is, therefore, entitled to judgment as a matter of law on Alford's retaliation claim.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted in full. The Clerk of Court is directed to enter judgment in favor of Defendant.

IT IS SO ORDERED.

       s/ Cameron McGowan Currie
       CAMERON MCGOWAN CURRIE
       UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 17, 2006